UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>KIRK PATTERSON,<br><br>Defendant. | Case No.: 16-cr-2558-BTM<br><br>**ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS** |
|---|---|

Presently before the Court is Defendant Kirk Patterson's motion to suppress evidence. (Def.'s Mot. to Suppress ("Def.'s MTS"), ECF No. 33.) The Court held an evidentiary hearing on June 21, 2017 and final arguments on July 14, 2017. For the reasons discussed below, Defendant's motion is **GRANTED**.

## I. FACTUAL BACKGROUND

On July 15, 2015, Probation Officers ("PO") Erich Schmidt, with the assistance of POs Adam Stanton, Carlos Gomez and Omar Pazarin, searched apartment No. 3 located at 5945 Streamview Drive[1] in San Diego, California. (Tr.

---

[1] The POs at the hearing refer to the address as "Streamview Avenue." However, a Google maps search confirms that it is "Streamview Drive."

of Evidentiary Hr'g, ECF No. 26, 7:25–8:2.) In January 2015, PO Schmidt was assigned to Kenneth Miller's ("Miller") case, an individual on parole and subject to a Fourth Amendment search waiver. (Tr. 7:21–24; 20:19–21:7.) Miller had previously disclosed a false address, which led PO Schmidt to investigate Miller's place of residence. (Tr. 8:20–24; 9:7–10.) On June 19, 2015, San Diego Police arrested Miller in front of 5935 Streamview Drive. (Tr. 9:13–17; 29:14–29:17; 31:22–32:7.) Miller was incarcerated for giving PO Schmidt a false address and while in jail, PO Schmidt monitored his phone calls. (Tr. 9:19–23.) During those calls, Miller indicated that he parked his car right in front of his home. (Tr. 9:23–10:2.) Based on these conversations, PO Schmidt believed that Miller lived on the 5900 Streamview Drive block. (Tr. 9:19–10:2.) PO Schmidt used media sources including Facebook and Google maps to gather intelligence on Miller's residence. Using Google maps, PO Schmidt observed that a car belonging to Alex Meyer, Miller's girlfriend, was also parked on the 5900 Streamview block. (Tr. 10:3–6.) PO Schmidt also found a video on Miller's Facebook page of him skateboarding in front of a stairwell that looked very similar to the one at the 5945 Streamview complex. (Tr. 12:16–21.)

  While Miller remained incarcerated, PO Schmidt drove by the 5900 Streamview Drive block and observed Miller's car parked in front of 5935 Streamview. (TR. 11:6–9.) Based on these observations, PO Schmidt believed that Miller lived with his girlfriend at 5935 Streamview Drive. (Tr. 11:6–9.) On July 15, 2015, PO Schmidt drove by the 5935 Streamview apartments with hopes of gathering further intelligence on Miller's residence. (Tr. 13:2–6.) PO Schmidt observed Miller's car parked outside 5935 Streamview and attempted to contact Miller who had been released. (Tr. 13:9–15.) Miller drove away but was subsequently pulled over at a nearby liquor store—Sky Liquor. (Tr. 14:19–22.) PO Schmidt interviewed an employee of Sky Liqour who stated that he had often seen Miller around the neighboring area. (Tr. 15:22–16:1.) After contacting

Miller, PO Schmidt called Meyer and asked her to pick up Miller's car. (Tr. 16:3–8.) Upon arriving, she confirmed that she lived with Miller, but refused to disclose an address. (Tr. 16:17–21.) PO Schmidt gave Miller's car keys to Meyer, but seized the other keys. (Tr. 16:22–25.)

Believing that both Miller and Meyer lived at 5935 Streamview Drive, PO Schmidt returned to those apartments and began interviewing neighbors. (Tr. 17:8–12; 46:8–12.) PO Schmidt made contact with a few neighbors, showed them a picture of Miller and asked them if they had seen him. (Tr. 17:7–12.) The neighbors stated that they did not know where he lived, but said that he lived in the adjacent building located at 5945 Streamview Drive. (Id.) Based on their statements, PO Schmidt went to 5945 Streamview and spoke to neighbors there. (Tr. 17:13–20.) PO Schmidt made contact with a man that was standing on the balcony of one of the apartments. (Id.) After asking the individual if he knew Kenneth Miller, the man stated that he did not but asked what his moniker was. (Id.) PO Schmidt informed him that Miller identified as "Scrap," and the individual pointed to apartment No. 3 and stated that "Scrap" lived there. (Id.)

PO Schmidt, accompanied by other POs and San Diego Police, conducted a knock-and-notice on apartment No. 3. (Tr. 17:23–25.) After no one answered, PO Schmidt unlocked the security door with the keys he seized from Miller. (Tr. 17:25–2.) The POs made a second knock-and-notice announcement, but no one answered. (Tr. 18:2–4.) PO Schmidt then proceeded to open the front door of the apartment with Miller's keys. (Id.) PO Schmidt and other POs entered the apartment and performed a protective sweep, which confirmed that no one was there. (Tr. 62:15–24; 63:8–18.) The POs first cleared the common areas, including the living room and kitchen, and then moved towards the back of the apartment where two bedrooms were located across from one another. (Tr. 65:14–17; 93:4–18; Def.'s Supplemental Br., Ex. AA, ECF No. 57.) During their protective sweep, the POs observed items throughout the apartment that

| | |
|---|---|
| 1 | belonged to multiple individuals, including Miller, Meyer, and Defendant. (64:2– |
| 2 | 5; 102:8–20.) In the kitchen, the POs observed drug paraphernalia in plain view. |
| 3 | (Tr. 67:4–6.) During their sweep of bedroom No. 1, the POs observed multiple |
| 4 | items such as letters, bank cards, and photos that led them to believe that the |
| 5 | bedroom belonged to Miller and Meyer. (Tr. 67:10–23; 71:19–21; 133:23–134:6.) |
| 6 | When sweeping through bedroom No. 2, the POs did not see any items |
| 7 | associated with Miller. (Tr. 72: 11–19.) Instead, the POs observed items |
| 8 | belonging to numerous other individuals, including Defendant's graduation |
| 9 | picture on top of a desk. (Tr. 68:10–17; 96:4–97:2; 134:10–16; Def's MTS, Ex. 1, |
| 10 | 16.) |
| 11 | After clearing the apartment, the POs conducted a more thorough search of |
| 12 | both the common areas and individual bedrooms. PO Schmidt searched |
| 13 | bedroom No. 1, while other POs including POs Gomez and Pazarin searched |
| 14 | bedroom No. 2. (Tr. 75:8–24; 119:19–25; 137:1–2.) During their search of |
| 15 | bedroom No. 2, the POs found ammunition in the top dresser drawer, and a |
| 16 | handgun and ecstasy pills in the closet. (Def.'s MTS, Ex. 1, 17.) |

## II. DISCUSSION

The Fourth Amendment protects individuals against unreasonable searches and seizures. (U.S. Const., Amend. IV.) Defendant moves to suppress evidence seized during a warrantless search of 5945 Streamview Drive, apartment No. 3. The Government responds with two arguments. First, the Government contends that Defendant does not have standing to challenge the search of the apartment. Second, the Government argues that the search is justified under either Miller's parole search condition or Defendant's probation search condition. The Court addresses these arguments below.

**A. Standing**

"Fourth Amendment rights are personal rights which, like some other

constitutional rights, may not be vicariously asserted." *Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978). Thus, to claim the protections of the Fourth Amendment, a "defendant must demonstrate a legitimate expectation of privacy in the place or item searched by showing an actual subjective expectation of privacy which society is prepared to recognize." *United States v. Davis*, 932 F.2d 752, 756 (9th Cir. 1991). A defendant has the burden of establishing that under the totality of circumstances, "the search or seizure violated his legitimate expectation of privacy." *Id.* Both the Supreme Court and the Ninth Circuit have held that an overnight guest has standing to challenge the search of a host's home. *Minnesota v. Olson*, 495 U.S. 91, 96–97 (1990); *see also Davis*, 732 F.2d at 757 (concluding that defendant had a legitimate expectation of privacy as an overnight guest where he had a key to the apartment, was free to come and go as he pleased, stored things there, and paid at least a portion of the rent for the apartment). However, bald assertions that a defendant was an overnight guest are insufficient to establish that he had a legitimate expectation of privacy in the house. *United States v. Armenta*, 69 F.3d 304, 308 (9th Cir. 1995) (holding that defendant's wallet, baptismal certificate, and social security card application, coupled with his sworn declaration stating that he was an overnight guest and a police officer's testimony that the defendant had stayed in the house the night before the search, were insufficient to establish a legitimate expectation of privacy).

Defendant asserts that he was a frequent overnight guest at 5945 Streamview Drive, apartment No. 3. In support of this argument, Defendant points to the evidence found in bedroom No. 2, coupled with the POs' own beliefs that the room belonged to him. The POs found the following items associated with Defendant in bedroom No. 2: (1) a graduation photograph of Defendant; (2) a graduation photograph of Defendant's child; (2) jail emails to Defendant; (3) a tow receipt for Amanda Beasley—Defendant's girlfriend; and (4) probation

paperwork for Defendant. (Def.'s Mot. to Suppress, ECF No. 33–2, 16–17.) Some of these items, such as the emails, probation paperwork, and tow receipt were found inside either a dresser or a PS4 box near the bed. (Id.)

Additionally, Defendant submitted a sworn declaration stating the following:

> During July of 2015, I was a regular overnight guest at 5945 Streamview Drive, Apartment #3, San Diego, California. I would sleep in the northeast bedroom, which has been described as "bedroom two" during our court proceedings. I slept in that room on July 14, 2015—the night before the contested search in this case. I planned to return to sleep in that room on July 15 or July 16.

(Def.'s Supplemental Br., Ex. ZZ.)

Finally, at the July 14, 2017 hearing, Defendant took the stand and testified that he began staying in bedroom No. 2 about a year and a half before the search. Though he was not on the lease, he paid $575 in rent and stayed there three to four nights a week. He stated that he slept there, used the common areas, and stored personal belongings there. The Court finds this testimony credible. Based on the totality of circumstances, the Court finds that Defendant was an overnight guest at the apartment. Accordingly, he has standing to challenge the search.

**B. Search Under Miller's Fourth Amendment Waiver**

Police or parole officers are permitted to conduct warrantless searches of parolees or their residences when certain conditions are met. *United States v. Grandberry*, 730 F.3d 968, 973 (9th Cir. 2013). First, the search must be conducted pursuant to the terms of the parolee's search condition. *Id.* Second, the police or parole officer must have probable cause to believe the parolee is a resident of the home to be searched. *Id.* Here, Defendant challenges the search on both grounds.

**1. Suspicionless Parole Searches**

When evaluating the constitutionality of a parole search, courts examine

1  "the totality of circumstances to determine whether a search is reasonable within
2  the meaning of the Fourth Amendment." *Samson v. California*, 547 U.S. 843,
3  847 (2006). Whether a parole search is reasonable "is determined by assessing,
4  on the one hand, the degree to which it intrudes upon an individual's privacy and,
5  on the other, the degree to which it is needed for the promotion of legitimate
6  governmental interests." *United States v. Knights*, 534 U.S. 112, 119 (2001). In
7  *Samson*, the Supreme Court concluded that the Fourth Amendment does not
8  prohibit police officers from conducting a suspicionless search of a parolee.
9  *Samson*, 547 U.S. at 857. The Court noted that parolees, standing on a
10 continuum of state imposed punishments, have fewer expectations of privacy
11 than probationers, given that parole is more akin to imprisonment than probation
12 is. *Id.* at 850. It rested its decision in part on the fact that "the parole search
13 condition under California law—requiring inmates who opt for parole to submit to
14 suspcisionless searches by a parole officer or other peace officer 'at any time,'—
15 was clearly expressed" to the defendant. *Id.* at 852.

      The Government argues that *Samson* applies and that no level of suspicion is required to justify this search. Defendant, on the other hand, attempts to distinguish this case from *Samson*, arguing that Miller was not subject to a suspicionless search condition. In *Samson*, the Court analyzed California Penal Code Section 3067(a) which states that every prisoner eligible for release on state parole "shall agree in writing to be subject to search or seizures by a parole officer or other peace officer at any time of the day or night, with or without a search warrant and with or without cause." Here, Miller's parole search condition states: "[y]ou, your residence, and any other property under your control may be searched without a warrant day or night by an agent of the supervising county, any peace officer, or law enforcement officer." (Gov't Opp'n to Def.'s MTS, ECF No. 35, Ex. 1, 3.) Because Miller's parole term does not include the language "with or without cause," Defendant contends that Miller was not subject to a

suspicionless search condition and the government is required to show at least reasonable suspicion of criminal wrongdoing.

In *United States v. Lopez*, 474 F.3d 1208, 1213–14 (9th Cir. 2007), the Ninth Circuit upheld the suspicionless search of a parolee where the condition permitted him, his residence, and any property under his control to be "searched without a warrant." In *United States v. Diaz*, 649 Fed. Appx. 373, 382 (9th Cir. 2016), the Ninth Circuit relying on *Lopez*, rejected Defendant's "argument that his parole agreement subjected him only to warrantless (as opposed to suspicionless) searches," even though it did not expressly include suspicionless searches. Under these cases, Miller's search condition permits both a warrantless and suspicionless search. However, these cases do not directly address the fact that *Samson* rested its decision in part, on the plain terms of the parole search condition which expressly cautioned of a search by a parole officer "with or without a search warrant *and* with or without cause." 547 U.S. at 852 (emphasis added). Moreover, the statute at issue in *Samson*, Cal. Penal Code. Section 3067(b), provides that an inmate who is eligible for parole shall be given notice that he or she is subject to terms and conditions and that the notice shall include "[a]n advisement that he or she is subject to search or seizure by a probation or parole officer . . . at any time of the day or night, with or without a search warrant or with or without cause." Here, Miller's search condition did not advise him that a search can be performed "with or without cause."

Nevertheless, the Court need not decide whether Miller's search condition subjects him to both a warrantless and suspicionless search because the Court finds that the search is not justified as a parole search.

**2. Probable Cause to Believe that Miller Lived at the Apartment**

Though a reasonable parole search does not run afoul of the Fourth Amendment, "before conducting a warrantless search pursuant to a parolee's parole condition, law enforcement officers must have probable cause to believe

8

that the parolee is a resident of the house to be searched." *United States v. Howard*, 447 F.3d 1257, 1262 (9th Cir. 2006) (quoting *Motley v. Parks*, 432 F.3d 1072, 1080 (9th Cir. 2005)). The Ninth Circuit has stressed that this is a "'relatively stringent standard,' which requires strong evidence that the parolee resides at the address. *United States v. Grandberry*, 730 F.3d 968, 976 (9th Cir. 2013). In *Howard*, the Ninth Circuit identified "certain patterns" that have emerged in cases in which officers had probable cause to believe that a parolee lived in a residence that he or she did not previously report. 447 F.3d at 1265–66. "The 'patterns' *Howard* enumerated were: (1) 'the parolee did not appear to be residing at any address other than the one searched'; (2) 'the officers had directly observed something that gave them good reason to suspect that the parolee was using his unreported residence as his home base'; (3) 'the parolee had a key to the residence in question'; and (4) 'either the parolee's co-resident or the parolee himself identified the residence in question as that of the parolee.'" *Grandberry*, 730 F.3d at 976 (quoting *Howard*, 447 F.3d at 1265–66). While these factors are instructive in assessing whether probable cause exists, "the ultimate question . . . is 'fact-intensive,' and cannot be answered by cross-checking a list of factors . . . ." *Id.*

Here, Defendant argues that the POs lacked probable cause to believe that Miller lived at the apartment because nearly all of the facts gathered during PO Schmidt's investigation support that Miller lived at the 5935 Streamview Drive address, rather than the 5945 address. While true that PO Schmidt's initial investigation led him to believe that Miller resided at 5935 Streamview Drive, these are not the sole facts supporting a finding of probable cause. After contacting Miller, PO Schmidt went to 5935 Streamview Drive and interviewed residents of that apartment building. While there, PO Schmidt showed neighbors Miller's picture and they stated that he lived in the adjacent building—5945 Streamview. Based on this tip, PO Schmidt went to 5945 Streamview and spoke

9

to an individual who was standing on an apartment balcony. The man stated that "Scrap" (Miller's moniker) lived in apartment No. 3. While these facts alone may not have been enough to satisfy the Ninth Circuit's relatively stringent standard, unlike the police officers in *Howard*, here PO Schmidt confirmed that Miller had keys to the apartment by checking them against the security door of apartment No. 3. *See* 447 F.3d at 1267 ("The police also affirmatively knew that Howard did not have a key to the West Bonanza residence, as they checked each of his keys against Barner's door on the morning of the search.").

Thus, based on the evidence presented at the evidentiary hearing, the Court finds that the POs had probable cause to believe that Miller lived at the 5945 Streamview Drive apartment No. 3.

**3. Scope of the Search**

Having determined that the POs had probable cause to believe that Miller lived in the apartment, the reasonableness of the search turns on whether the search of bedroom No. 2 fell within the scope of Miller's parole search condition. For the reasons discussed below, the Court finds that it does not.

Unable to find federal precedent dealing with similar circumstances, the Government relies on search warrant cases to argue that the search of the entire apartment, including bedroom No. 2, was reasonable under Miller's fourth waiver. The Government urges the Court to take a similar approach to search warrant cases and concentrate on whether the contested area is part of the larger living unit and whether the entire area could be involved in the suspected criminal activity. However, the Court does not find these cases to be applicable.

In cases involving search warrants, the scope of a search turns on this inquiry because the search warrant itself defines those parameters. *See Al-Kidd v. Ashcroft*, 598 F.3d 1129, 1134 n.3 (9th Cir. 2010). "The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched

for and seized are located on the property to which entry is sought." *United States v. Adjani*, 452 F.3d 1140, 1146 (9th Cir. 2006). Indeed, that is why the Ninth Circuit in *United States v. Ayers*, 924 F.2d 1468, 1480 (9th Cir. 1991), held that a search warrant for the entire premises of a single family residence was valid, notwithstanding the fact that it was issued based on information regarding the alleged illegal activities of just one of several occupants of the residence. Based on probable cause that evidence of the defendant's drug dealing would be found in his residence, the search warrant at issue authorized the search for narcotics throughout the entire single family residence. *Id.* at 1479. Because the officers executed the search in accordance with the terms of the warrant, the court found that the search of the entire premise was not overbroad or unreasonable. *Id.* at 1480.

By contrast, the critical element in a parole search is the parolee, as it is the State's overwhelming interest in supervising a parolee and reducing recidivism that "warrant[s] privacy intrusions that would not otherwise be tolerated under the Fourth Amendment." *Samson*, 547 U.S. at 853. While the Ninth Circuit has recognized that generally, a condition of parole that permits warrantless searches provides officers with the limited authority to enter and search a house where the parolee resides, even if others also reside there, these searches are not without limitations. *See Motley*, 432 F.3d at 1079. As already discussed above, the Ninth Circuit requires that officers hold probable cause to believe that the parolee resides at the residence before entering. *Id.* Once inside the home, the Supreme Court of California has held that the scope of any parole search, as with other searches, is limited to "those areas of a residence over which the probationer is believed to exercise complete or joint authority." *People v. Woods*, 21 Cal. 4th 668, 681 (1999) (citing *United States v. Matlock*, 415 U.S. 164, 170–71 (1974)); *see also United States v. Eibeck*, No. 14cr3488-CAB, 2015 WL 894655, at *5 (S.D. Cal. Feb. 25, 2015) (applying *Woods* to a

1 probation search and finding that the defendant had common authority over a
2 hotel room so as to justify the entry and search of the entire premises); *Gutierrez
3 v. County of L.A.*, No. CV 107589-CAS, 2013 WL 3821602, at *11–12 (C.D. Cal.
4 July 22, 2013) (applying *Woods* and finding an issue of disputed fact as to
5 whether the officers could have permissibly entered non-probationers' separate
6 bedrooms). This required common authority rests on the "mutual use of the
7 property by persons generally having joint access or control for *most purposes* . .
8 . ." *Id.* (citing *Matlock*, 415 U.S. at 171 n.7 (emphasis added)). Additionally,
9 officers must have "reasonable suspicion to conclude that the probationer owns,
10 controls or possesses a particular item within the probationer's residence in order
11 to search [or seize] that item." *United States v. Bolivar*, 670 F.3d 1091, 1096 (9th
12 Cir. 2012) (citing *United States v. Davis*, 932 F.2d 752, 758 (9th Cir. 1991)).

Applying these principles to the parole search here, the Court finds that the POs did not have "reasonable suspicion" to believe that Miller exercised complete or joint control over bedroom No. 2. *See Bolivar*, 670 F.3d at 1096. The Government has not presented sufficient evidence to support that Miller had "joint access or control for *most* purposes." The POs did not know whether Miller was on the apartment lease or whether he paid rent, which would have strengthened the belief that he exercised joint control over the *entire* apartment. Nor were the POs aware of a special relationship between Miller and the cohabitant of bedroom No. 2 that may have given rise to a presumption of control of property. When the Court asked PO Schmidt what served as the basis for his determination that Miller had control over bedroom No. 2, he stated: "Okay. Well, the keys on his chain opened the apartment, and the bedrooms inside were open and unlocked. There was no expectation of privacy to any other resident that they had a separate dominion and control given that they shared the kitchen, the one bathroom, and the doors were open." (Tr. 101:23–102:7) Though the fact that Miller had access to and possessions in the common areas is enough to

establish that he had joint authority over shared spaces, it is insufficient to establish that he had joint authority over a cohabitant's separate bedroom. Additionally, the mere fact that the doors were open is also not enough to support a reasonable belief that Miller had joint control over the second bedroom, as the standard is not general access, but rather "joint access or control for *most purposes.*" *Woods*, 21 Cal.4th at 681 (emphasis added).

Even assuming that these two facts were enough to initially support a reasonable suspicion, any notion that Miller had joint authority over the bedroom was dispelled upon discovering Defendant's personal items in the dresser, but finding none of Miller's items in the room. In fact, the POs' own determinations that bedroom No. 1 belonged to Miller and that bedroom No. 2 belonged to another individual support a conclusion that they operated with no reasonable suspicion to believe that Miller had, at least, joint control over bedroom No. 2.

Though the Court has been unable to find controlling federal precedent dealing with the facts at issue here, by analogy, cases within the context of third-party consent searches are worth mentioning. In *United States v. Kelley*, 953 F.2d 562, 566 (9th Cir. 1992), the Ninth Circuit upheld a third-party consent based search by finding that a defendant's housemate had common authority over his separate bedroom. There, the police knew that the housemate and the defendant had rented the apartment three days before the search, that she signed the rental agreement, that they had separate bedrooms, and that she was allowed to access the defendant's bedroom to use the telephone, which was located on the right-hand side of his room, in the back corner. *Id.* at 564. At the time of the search, the door to the defendant's bedroom was also open. *Id.* Based on these facts, the Ninth Circuit held that because the housemate had access to not only the common areas of the apartment, but also to the defendant's separate room where the apartment telephone was located, she had authority to consent to a search of his separate bedroom. *Id.* at 566; *but see*

*United States v. Heisman*, 503 F.2d 1284, 1287 (8th Cir. 1974) (holding consent invalid where a housemate had unlimited access to the common areas of the apartment but only limited access to the defendant's private bedroom, even though the bedroom did not have a door). In contrast to *Kelley*, in *United States v. Dearing*, 9 F.3d 1428, 1430 (9th Cir. 1993), the Ninth Circuit held that a caretaker and occasional housekeeper living at the defendant's home did not have apparent authority to consent to a search of the defendant's separate bedroom. There, the police acted with knowledge that the caretaker lived at the home, had access to the entire house, and had entered the bedroom on prior occasions. *Id.* at 1429. Though the officer knew the bedroom belonged to the defendant, and not the caretaker, the police acted on the belief that he had access or control over the bedroom. *Id.* at 1430. The Ninth Circuit found that these facts were insufficient to support a reasonable belief of common authority because "[t]he mere fact of access, without more, does not indicate that the access was authorized." *Id.* Indeed, the court distinguished the case from *Kelley*, explaining that, unlike in *Kelley* where the police knew the consent-giver had unrestricted permission to enter the co-tenant's bedroom to use the phone, it was the officers' lack of knowledge about the extent of the caretaker's permission to enter the defendant's bedroom that made the officers' belief of common authority unreasonable. *Id.*

Here, the Court similarly finds that the facts do not support that Miller had common authority over bedroom No. 2. Accordingly, the POs' search of bedroom No. 2 falls outside the scope of Miller's Fourth Amendment search waiver.

**E. Search under Defendant's Fourth Amendment Search Waiver**

Alternatively, the Government attempts to justify the search of bedroom No. 2 by relying on Defendant's own probation search waiver. At the outset it is worth mentioning that the Court has not been presented with Defendant's

judgment of conviction and therefore does not have direct evidence as to whether Defendant is on probation or parole. However, because the Government, the POs at the hearing, and the Defendant himself all state that he was on probation at the time of the search, the Court assumes so.

As a threshold matter, the Court must determine whether the POs were aware of Defendant's search waiver *before* searching bedroom No. 2. *See United States v. Job*, 851 F.3d 889, 896 (9th Cir. 2017) ("Police officers must know about a probationer's Fourth Amendment search waiver before they conduct a search in order for the waiver to serve as a justification for the search."); *see also Moreno v. Baca*, 431 F.3d 633, 641 (9th Cir. 2005) ("police officers cannot retroactively justify a suspicionless search and arrest on the basis of an after-the-fact-discovery of . . . a parole [search waiver] condition."); *People v. Robles*, 23 Cal. 4th 789, 797 (2000) ("Significantly, a search of a particular residence cannot be 'reasonably related' to the probationary purpose when the officers involved do not even know of a probationer who is sufficiently connected to the residence. Moreover, if officers lack knowledge of a probationer's advance consent when they search the residence, their actions are wholly arbitrary in the sense that they search without legal justification and without any perceived limits to their authority.").

At the hearing, the POs who conducted the search offered conflicting testimony as to when they contacted Defendant's PO—PO Darin Rimmer—to confirm that he was subject to a Fourth Amendment search waiver. Initially, PO Schmidt could not clearly remember when he contacted PO Rimmer. (Tr. 76:4–5.) Later in his testimony, he recalled discovering Defendant's probation appointment slip during the protective sweep and then contacting PO Rimmer before PO Pazarin searched bedroom No. 2. (Tr. 78:2–5.) Conversely, PO Pazarin testified that he discovered Defendant's probation slip in the dresser drawer during his actual search of bedroom No. 2. (Tr. 142:21–143:7.) After

1  finding the probation slip, he paused his search to alert PO Schmidt of
2  Defendant's graduation picture and appointment slip. (Tr. 143:5–24.) Once PO
3  Schmidt confirmed Defendant's search waiver, PO Pazarin continued his search
4  of the trop dresser drawer and found the ammunition. (Tr. 144:1–6.)

Most notably, POs Schmidt's and Pazarin's accounts were contradicted by PO Rimmer's testimony. (Tr. 111:8–112:13.) PO Rimmer recalled that on July 15, 2015, he received three separate calls from POs that had conducted the search of the apartment. (Tr. 110:19–111:2.) The first call was from PO Schmidt, informing him of what they had found at the apartment. (Tr. 111:8–11.) He stated that PO Schmidt told him that they found contraband possibly belonging to Defendant, including a firearm, ammunition, and ecstasy pills. (Tr. 112:5–11.) Though PO Rimmer could not recall the substance of the second and third call, he did testify that it was during that first call that he learned what the POs found at the apartment. (Tr. 112:21–113:6.) Given the conflicting testimony between the POs who conducted the search, and PO Rimmer's credible testimony of what he learned during that first call, the Court finds that the POs did not contact PO Rimmer to confirm Defendant's search waiver until after completing their search of the apartment. Moreover, the mere discovery of the probation slip is not enough to put the POs on notice of Defendant's fourth waiver because under California law, not all probationers are subject to Fourth Amendment waivers. *See* Cal. Penal Code § 1203.1(j). Unlike parole which statutorily imposes a search condition, with probation "the Legislature has empowered the court, in making a probation determination, to impose any 'reasonable conditions, as it may determine are fitting and proper to the end that justice may be done . . . .'" *People v. Olguin*, 45 Cal.4th 375, 379 (2008) (quoting Cal. Penal Code. § 1203.1(j)). Consequently, Defendant's search condition cannot provide a justification for the search of bedroom No. 2.

Nevertheless, even assuming that the POs knew that Defendant was

1 subject to a search condition, they did not have probable cause to believe that he
2 lived at the apartment or reasonable suspicion to support that he had joint control
3 over bedroom No. 2 or controlled, owned, or possessed the dresser.  The
4 Government relies on Defendant's probation search waiver but has failed to
5 submit sufficient evidence to justify the search.  Prior to entering, the POs had no
6 evidence to support the belief that Defendant lived at the apartment, significantly
7 because Miller was the target of the search.  Once in the apartment they
8 observed items associated with Defendant, but Defendant's graduation picture
9 and probation documents without more are not enough to establish that he had
10 control over bedroom No. 2 or the dresser.  As such, Defendant's search
11 condition cannot justify the search.

12       Lastly, the Government asserts the good faith exception to the exclusionary
13 rule, arguing that *Job* was only recently issued.  "[E]vidence should be
14 suppressed 'only if it can be said that the law enforcement officer had knowledge,
15 or may properly be charged with knowledge, that the search was unconstitutional
16 under the Fourth Amendment.'" *United States v. Schesso*, 730 F.3d 1040, 1050–
17 51 (9th Cir.2013) (quoting *Herring*, 555 U.S. at 143).  The Court relies on *Job* for
18 the proposition that a parole officer must be aware of a probationer's search
19 condition before conducting a warrantless search.  *See* 851 F.3d at 896.
20 Because the law was well-settled before the search on this issue, the exception
21 does not apply to these facts.  *See Moreno*, 431 F.3d at 641; *see also Robles*, 23
22 Cal. 4th at 797.

23       Therefore, the Court finds that the search of bedroom No. 2 was
24 unreasonable under the Fourth Amendment and suppression of the evidence is
25 warranted.
26 //
27 //
28 //

## III. CONCLUSION

For these reasons, Defendant's motion to suppress is **GRANTED.**

**IT IS SO ORDERED.**

Dated: August 4, 2017

_____
Barry Ted Moskowitz, Chief Judge
United States District Court